The next piece on the docket is 523-0644, People v. Lorenzo Duvern Johnson Good afternoon, Your Honors. May it please the Court, my name is Katherine Donahoe and I represent the appellant DeVale Johnson. I intend to focus on issues 1 and 2 in the briefs, but I can answer any other questions. This was a complicated case of first-degree murder. The jury sat for almost two weeks and heard testimony from over 40 witnesses. And we know what happened to the victim. Jumante Allison Sr. was shot to death outside his mother's home in Carbondale by men shooting multiple weapons out of a moving black Ford Expedition that belonged to a woman named Tanaskia Mourning. The evidence showed there were three men in the truck, and Victor Purdyman and Michael Williams confessed to being two of them. But the evidence as to the third man in the truck was not as clear. So to prove that the third man was DeVale Johnson, the prosecution introduced what it called its, quote, star witnesses. And the star witnesses were not people who personally saw the shooting, because even the prosecution acknowledged that those witnesses were flawed. Rather, the star witnesses turned out to be improper hearsay and improper opinion testimony about the solid police work that led investigators to conclude for themselves that Mr. Johnson was guilty. So first, the state began its case playing an unredacted audio recording of Mr. Johnson's police interrogation, which consisted of a detective reading aloud from a probable cause affidavit that was riddled with inadmissible hearsay and conclusions made by other officers and statements made by people to the police that were never introduced through witness testimony. Then later in the case, the lead detective was improperly allowed to testify at length about his personal interpretation of the evidence the jury had heard, including complicated video compilations, geolocation data, and other evidence. And this was over the objection of the defense that the opinion testimony invaded the province of the jury. Was there a limiting instruction given at the time that the officer testified to what was in the videos? When he offered his opinion testimony, not at the time that he gave that testimony. The jury got standard instructions that they could make their own determinations, but he also was specifically allowed over the objection of the defense to testify to his opinion and conclusions as the lead detective. And he referenced the evidence that was before the jury. Also, he referenced that he had studied other photos and videos and conducted this process of elimination to determine that Mr. Johnson was the third man in the video, instead of letting the jury make that determination for itself. Was there a Thompson hearing in this case? Yes, there was a Thompson hearing, but Thompson is a two-part inquiry, and in this case, the trial court only did the second part. So the trial counsel objected that the officer shouldn't be allowed to testify to his opinion that the third man in the video is Mr. Johnson because he had no prior familiarity with him. So Thompson is two parts. First, would this witness's testimony be helpful in identifying the person in the video, which is generally based on some contact with the individual that the jury wouldn't have. So usually it's someone who's personally familiar. The second part of that inquiry is if the person offering the opinion testimony is a police officer, is there going to be some prejudice here by suggesting to the jury that the defendant had prior police contact and so has a criminal history. And here the trial judge only did that second part and basically found, well, it's not prejudicial because he said right there he's never met him before, he just studied the evidence. But in skipping to the second part, the trial judge didn't really consider, well, is it helpful. And in this case it's not helpful. It's just a lay witness offering his lay opinion about the evidence instead of letting the jury make that determination for itself. And that kind of ties back into the first issue that we raised as well because that also involved Detective Nutting from the Orlando Sheriff's Department reading out other police conclusions of unnamed officers that Mr. Johnson was depicted in the video and that it looked like he had something concealed in his pant leg. And so, again, telling the jury what the police officers decided the video showed instead of allowing them to make that determination on their own. And I may be asking a redundant question. I believe that Justice Cates asked about limiting instruction. And I'm not sure, was there a limiting instruction? I'm not sure I heard the answer to that. Just the standard instructions. There wasn't a limiting instruction. As to any of the video evidence or the other crimes evidence? As to the other crimes evidence, there would have been the standard instructions limiting that. But as to this video evidence, the detective was specifically allowed to offer his opinion and the jury was told they could consider that because it was a lot of complex information. He had 50 different video clips spliced together in chronological order and it was totally appropriate for him to testify describing how he collected that evidence, how he compiled it, where these cameras were located. But as to identifying the actual individuals in them, that was outside of what would have been appropriate because he started to offer his own opinion about the inferences that he made from reviewing this evidence. And we're talking about this time period of 6.11 p.m. when three people appear to get into this black truck, 6.26 p.m. when three people get out. And the jury, all the witnesses said, you know, this is, these videos are blurry. Even Detective Bethel said the distance of it, it's across the street in a different apartment complex. He can't tell who anyone is just by looking at the video. And so he referenced this process of elimination he made based on who he talked to witnesses and found were at this barbecue that afternoon and looking at other pictures, looking at other videos because he was asked, does, for example, Tracy Mourning, who also lived at that apartment with Taniskia Mourning, doesn't he also have, like, a slender build and light-complected skin? And he said, well, I reviewed this other video and I saw him walking a dog and I don't think that was the same person. I think it was DeVale Johnson. Those are not the sort of conclusions that were appropriate in this case. And the state will argue that there was a lot of other evidence, but that doesn't mean it was good evidence. The statements from the probable cause affidavit, the Detective Bethel's assessment of the evidence that he offered to the jury, there's a reasonable probability that this affected the outcome of the case because other than that, we had a weak identification from the victim's brother who didn't go to the police until four days later and after he asked his nephew, hey, who did it? We have these untrustworthy accomplice witnesses who pled down from first-degree murder to much more less serious offenses. They're getting out in 2028 and 2030 as a result of that. Well, Mr. Johnson's the only one convicted of first-degree murder. In his police interview, he consistently denied involvement. And the most damaging things from the police statement are what the detective said, other people said. We've got these blurry surveillance videos, a picture of him with a murder weapon over a year before the murder happened, and then the murder weapon is found in the home of some totally unrelated person and we don't even know how he's connected to the case. So in light of all of that, the police, the solid police work, as the state called it, that was a star witness undergirding its case because the witnesses were weak, the evidence was ambiguous. So this case began with the detective reading from a probable cause affidavit, summarizing the conclusions of other police officers, relying in part on this inflammatory hearsay, like if we can't get this done, we'll get the dad, and then celebrating afterwards. Yeah, and we're, yeah, we got him, we got him. None of that was testified to by a witness at trial. We could have just redacted the last few minutes of that audio recording and it would have been much less inflammatory. But we, they got before the jury due to trial counsel's ineffectiveness and erroneous rulings by the trial court. So we ask this court to reverse Mr. Johnson's convictions and remand for a new trial. Well, thank you. Okay, thank you for your arguments. We have time for rebuttal. Is it Mr. Booth? Yes, ma'am. Okay, Mr. Booth. May it please the court. Counsel. The individual pieces of evidence were assembled by the prosecution painstakingly and laid out for the jury in order for them to determine the defendant's guilt because of his involvement in the shooting death of the victim in this case. Each of the facts were individual strands assembled together into a web of evidence from which the defendant could not escape because he did it. Now, there's a variety of different categories of evidence here. The evidence as to the vehicle itself that was used in the shooting, defendant's vehicle, the murder weapon, its involvement with defendant, including his recognition of a person entering the jail. He identified by name to his partner at the time. And in reviewing the video, it shows that his partner didn't bat an eye, didn't say anything, didn't ask who's that. She heard, Griffith's here, and he was caught with a rifle. And she knew what that meant because the defendant knew what that meant because they had given him the murder weapon. And they knew that the murder weapon was now in the hands of the police. Further, the other pieces of evidence showed defendant's guilt, which is overwhelming and therefore passes by both prejudice and the harmless error analysis, even before getting into the individual merits of any defendant's claim. The history and motive of defendant as well as the individuals at issue in the case. These shootings, these events that ultimately culminated in the victim's death, all contributed to the story of what happens between defendant and the victim's son that led not only to an attempted shooting on the individual date, but also why this defendant would have gone out as he had before with his accomplices to shoot at this house and shoot at, specifically, a totally uninvolved person, which is the target's father. Because of that, the other evidence on the other shootings was appropriately omitted and necessary to contextualize the murder. Defendant's consciousness of guilt obviously plays into things as well, commented on by pleasant counsel. However, the fact that he immediately fled the vicinity, it's because he knew he was involved. He fled to Florida. That indicates that he knew he was guilty. He was involved in the shooting. That's why he left while at all times remaining in close personal contact with someone that he himself blamed for the shooting when he was caught. When he is present in Florida and talking with the detective, the most important things that are mentioned during that interview are not what anyone else said when the detective, who had already acknowledged he was not involved in the investigation, he was just trying to ask questions, acquired the effect on the listener in order to see how he would react to these questions, and then Detective Nutting asked him all of these questions, and the main part is not his questions but defendant's answers. Well, I don't know who Michael Williams is. Well, my cousin was probably involved. He was involved in a beef between Kyra and Kerry. Are you talking about the Florida officer's exchange with him? Correct, the interview that the defendant had in Florida. Didn't he ask for a lawyer? At some point, Your Honor, that was litigated below, and none of the content. First of all, the court identified that it was an equivocal request, that it didn't rise to the level of an actual Sixth Amendment invitation of the right to counsel. But the officer then said he wanted to read the rest of something, and he's reading this probable cause warrant as he's talking to the defendant. I don't understand how that gets admitted and is not hearsay. Well, Your Honor, first of all, it goes to the effect on the listener. When he is going through the investigation that he has no involvement with, that he admitted to the jury he had no involvement with, that he had no understanding of the veracity of those claims, and that he was merely conducting an interview on behalf of another law enforcement agency. Are you saying that you're using that to prove the basis for what he does next versus the truth of the matter asserted? Two parts. First of all, it is part of the context of the defendant's answers. So his answers aren't going to make sense if we don't know what the questions are and what the conversation is. Second of all, the effect on the listener is the most important part here, where regardless of what the other investigation has showed, what we want to know is how the defendant is reacting to these claims. And his response that, well, it was this person, it was another person, it was Pergamon, he must have been involved, oh, I do know who Micah Williams is, those statements are what the detective was trying to determine, how he would react to the information that he has provided. And there is no objection here below. But not only is there no prejudice to be shown by that, but also the strategic considerations are part of this event as well. In this case, not only was the defendant able to produce his responses and denials to the steps of the investigation, he was able to do so without exposing himself to cross-examination. Let's talk about the potential errors in the case. What about this issue where we allow a police officer to narrate the video without a full Thompson hearing? So, Your Honor, first of all, I would state that the record shows the basis for the Thompson findings in this case. Here, there is not a chronological component to Thompson. It is not that the detective has to have a pre-existing knowledge of the defendant before the case starts or else he can't talk about it. His extensive review of many, many, many pieces of footage, he explained to the jury and said why he was including them. That was necessary to not have the jury sitting there watching a 20-plus minute video and trying to figure out what they're watching and why. That's why it was helpful to the jury in not asking these laypersons not involved in the investigation of the case to identify why these pieces of footage are shown. The defendant stated that it was found for him to... He points out the defendant. Yes, based on... He identifies why he thinks it's the defendant, though. At no point was this taken away from the jury. The instructions all stated. The jury figures out the facts. The officers do not have a special place in the courtroom. They can provide testimony, but it is absolutely always the juror's responsibility to determine who is credible and determine the basis for what they say and ultimately make their own finding as to the facts. Does Thompson recommend a limiting instruction? It allows for it, but there's... Your Honor, I don't believe there's a requirement. This is... I didn't say requirement. Fair enough. But that goes to the potential strategic considerations at play. Do you want to emphasize the testimony? Do you want to try to call attention to this detective who did a fairly voluminous job of explaining why he reached the conclusions he did? And defendant was free to and did challenge those determinations that the detective made. Tried to undermine why the detective thought what he did. And moreover, each significant point, I would argue, that the detective made was corroborated by other witnesses. The Martins provided significant testimony in saying, that's my car, I was dropping off defendant in Perttman. Perttman's very distinctive clothing helped to identify where he was at different events. And moreover, the cell phone evidence helped to corroborate all of the steps in the video where the detective did, again, a comprehensive job of trying to chart exactly where this car went, what it was doing, what the occupants were up to, and this was all corroborated by the cell phone data showing this is where they were at this time that is consistent with the footage showing the expedition at this location. What about the video of the defendant's tattoo with the guns? Was that supposed to be admitted? Are you referring to the picture that was admitted? Or the separate Facebook pictures or the... I'm sorry, there are three categories. Yeah, well, the one was a video of a video. Yes. What about the photographs? So the photographs were present and showed defendant's link to the fireworks. They had evidence? Yes. He had a personal photograph of defendant's person that was independently conducted by the jail, I believe, and then presented to identify what defendant looked like as an objective fact so that defendant didn't have to be paraded in front of the jury or anything like that. In addition, not only did the prosecution in good faith attempt to produce more evidence of defendant's involvement with the murder weapon, that's the video that was ultimately not allowed in, but also... It was testified to. It was. That was foundational... We had it disallowed by the court and then testified to. How does that happen? Your Honor, it was foundational testimony that the people were using to show what the video was and why it was presented, why it had the foundation and was appropriate for the jury's review. It's not clear... Was it barred by the court? The admission of the video was. The testimony was not. The testimony? Oh, we're distinguishing between the testimony and the actual video itself? We'll leave the court to respond. Yeah. So the court's ruling was that... Pardon me. The court's ruling accepted the objection... Sustained the objection, pardon me, of defendant as the admission of the video. It's unclear what precisely... The court wasn't asked to explain its ruling. But up until that point, the prosecution had been laying out all of the reasons why this video was relevant to the case, it was what it said it was, and in response, defense counsel functionally said that there was no knowing whether or not the video had been tampered with. That was the majority of the argument that went into the ruling on the motion. Up until that point, the prosecution had been laying out the foundation, what was going on, where he got the video, who he got the video from, and this video's link. Ultimately, the prosecution would have used it to link it to the underlying facts because it had to do with the defendant's possession of the murder weapon. Now again, if I may have a little longer to respond, this ultimately went to whether or not the defendant was linked to the murder weapon. This was a piece of evidence that bore on that. It was not necessary for that. There was a wealth of evidence showing that the defendant was involved with this murder weapon, and the prosecution's attempt to submit evidence on that point, the people maintained was proper, and even if the court ultimately disagreed that this video was permissible, the other evidence, including particularly the Facebook images showing the defendant holding the same gun with the same types of distinctive aftermarket alterations, as well as defendants' admission to his girlfriend that he knew this guy who was involved with this firearm that was picked up, among the other, I don't mean to forfeit any matters within my brief, but among the other arguments in the brief showed why this evidence was sought and moreover not necessary to determine the fact of defendant's guilt. May we go a little longer? Yes, absolutely. I'm going to ask the other attorneys too, but both of your briefs go into a lot of argument over what is called other crimes evidence. Do you have any comments you want to make on that? We're going to give you a little more time. Any thoughts that you want to mention on that? As to the admission on the other shootings, Your Honor? Well, in the appellant's brief and in your response, it refers to it as other crimes evidence. So that would mean in the brief it's the video from July, shootings at another house earlier. It's gone into extensibility, but you're not mentioning it here, so I'm not sure if you have any thoughts on that that you want to bring up. Go ahead. That's on giving you that opportunity. Yes, Your Honor. Thank you. The other crimes evidence, or rather the evidence of the continuing narrative at play in this case was properly admissible. This case, if all the jury heard was a car drove up, a car shot, and a car drove away, even with immediately before and immediately after, even with those facts, that does not tell the jury what was going on or why. If the jury is left there to think that this was a one-off event, that there was no real independent reason for the collateral damage for this victim instead of someone else, this location instead of somewhere else, it's just a random shooting. Now, while the other shooting that day wasn't objected to by defense, that was less of a fight, so to speak, the other facts of the case, the continuing narrative that played out, where the prosecution showed it started with a girl, these guys hated each other, and they started shooting at each other's houses. The jury deserved to know that. And in order to evaluate the facts of this case, and under the law and the facts that were presented, it was appropriately submitted in order for the jury to know what was going on. I'd be happy to speak further on any specific points if you'd like. One more question, a follow-up to Judge Cates. Explain to me the way you view the judge's ruling that the video from, the original video of the hand and the tattoo and the guns was not admissible, but then subsequently there's a lot of testimony from the officer about what that video contained. And you mentioned that it was used later as identification. So how does that happen? Well, the testimony itself goes to the people trying to prove up, ultimately, their attempt to admit the video that was recorded from the victim's son's phone. The people in good faith attempted to introduce that, and an objection was sustained. And that's where it stopped. The other evidence, though, is not necessarily limited to that. Defendant's tattoo not only bore on that video itself, but also the Facebook pictures that defendant had saved to his account that independently showed his connection to the murder weapon. And so aside from the ruling on that video, the people maintain that there were other, in addition to other pieces of evidence, that the tattoo specifically bore not only on that video from the victim's son, but also on the Facebook pictures that defendant had for the public to see. Thank you. I'm not sure we're getting the answer that the question demands, so let me try to ask it specifically. I'm talking about the video of January 2020. And it was where the defendant, there's a demonstration of guns showing the defendant's tattoo. Yes, Your Honor. That was sustained. Yes. That objection. But isn't it true that there was testimony given regarding that video regardless of the fact that the judge sustained the objection? Yes, and that was never, there was no motion to strike or otherwise. No, but isn't that error when that happens? Well, defendant hasn't submitted that as plain error or otherwise argued it in that way. It's not argued as cumulative error? It still has to be presented by the party. The party is obligated to raise its own arguments. But aside from that, the cumulative error when it does involve, says cumulative error when it involves forfeited matters must itself rise to the level of plain error. And when you're evaluating that plain error, you have to evaluate, the Illinois Supreme Court requires that each of the pieces, or that the claims must be assessed. So that error occurred. Yes. And then? And also that it affected the outcome. Right. Yes, of course. But in addition to that, when evaluating plain error, any claims that fail along the way cannot contribute to whether or not there was plain error in defendant's case. That's case audit. But even aside from that, the people maintained that there was a basis for the questioning, that there was not a motion to strike, and that nonetheless any testimony that defendant was holding this firearm, was linked to this firearm, was established by numerous other pieces of evidence. His own Facebook photos. No, I understand. You are, you don't support the judge's ruling, is what you're saying. Correct. But did the court rule that way? That's what we were trying to ask. Yes, I'm not trying to. It was a ruling, it was sustained, and then the testimony came in. I believe the, I apologize if I'm misremembering, I believe the testimony as to that video was presented before the motion to admit the evidence was submitted, and that after that motion there were other attempts to cure any foundational issues, since defendant was claiming that maybe it was doctored, maybe it was unreliable, and so more information was attempted to be produced. The prosecution's attempt to submit evidence, though, is not error. No, but ultimately the court sustained the objection. Yes, and the video was not presented. I'm sorry, but the testimony was. I'm not trying to undermine that, Your Honor, but what I am trying to say is that when the court made a ruling, while the prosecution still attempted to cure the issue that gave rise to the sustaining the objection, it was not an attempt to circumvent admitting the evidence properly. Okay. Thank you. Thank you, Your Honor. Thank you for your arguments. It sounds like we have gone over, which means you will get some extra time as well, should you require it. We're not encouraging it, but should you require it. Thank you, Your Honor. So I would first like to respond to the other crimes issue. And so prior to trial, the prosecution filed a pretrial motion to admit other crimes with a laundry list of anything ranging from a tense encounter to a parking lot, just somebody's cousin fired a gun at somebody's other cousin. Ultimately, there were three different things that came up at trial. The first one, chronologically at least, was the January 26th video that you've described and asked about. And that came up during two different witnesses' testimony. The first was Officer Turk, who arrested Jumante Jr. at some point in January for a traffic infraction. And he testified that he was trying to curry some favor and get out of his own predicament and showed him a video. And they weren't able to establish foundation because the police officer basically took his cell phone and filmed Jumante while he was playing it on his phone. But unfortunately, the contents of that video were testified to by him. And then again during Detective Bethel's testimony, Detective Bethel, who again, as we've argued in other issues, all he did was review the video and compare it to other photos. But he described the video in detail as having this distinctive tattoo on the hand that was seen in photographs of Mr. Johnson and having these guns and there was some intimation that these were like, this was a threatening video. And the court found the foundation was not established. The video did not get to the jury. That testimony did. It should have been stricken. Our position is that the court should have struck it to Esponte, but counsel did have an ongoing objection to all of the other crimes evidence. And I want to get into – Did he object specifically to that evidence? To the testimony? Counsel did not, after the fact, say, Your Honor, please strike this testimony, but did object to all of the other crimes evidence from the beginning and throughout without, you know, constantly interrupting witnesses to make additional objections. It was clear that defense counsel objected to all of this. The other two other crimes, March and July – March is the only one we have a little bit of evidence about, other than someone saying, yeah, someone shot someone's house. March – but the evidence we have was just that an evidence technician was asked to process a car and he took a picture of the registration. It was registered to DeVale Johnson and India Martin, and there was some firearm evidence there that linked up to the SAG arms rifle that was later used in this murder. But there was – no one connected Mr. Johnson to that. Actually, a detective mentioned that three other people who all lived with Tomaskia Mourning were arrested related to this. So we just argue that that does not meet the threshold of showing, beyond a mere suspicion, that Mr. Johnson was even connected to it. You can't introduce other crimes evidence without proving, more than a mere suspicion, that the defendant actually – that a crime was committed and that it was committed by the defendant. But you're not saying that section of the statute isn't limited to just other crimes. It's commonly called other crimes, but it says other acts. I believe the same law would apply, though, that Mr. Johnson was not sufficiently connected to it. Nobody – he was – so it wasn't admissible. It just kind of put all this background suspicion, just like a lot of the other states' evidence, that he was a bad guy and that he was going back and forth beyond just August 17th without actually doing the work, despite all the solid police work in the rest of this case, without doing the work of connecting them. And if – and I'd also just like to note that counsel appears to, again, be arguing, similar to the prosecutor at trial, that the detective did a comprehensive job, that the detective did a lot of work. And we are not disputing that. The problem here is that the prosecutor – they didn't do the work. They wanted to put the detective on the stand and testify – you know, tell the jury all the great work you did. But they needed to do the work to present the evidence to the jury in a way that they could make their own findings rather than have the detective say, yes, that was Mr. Johnson in that video getting in the truck. I believe that's him getting afterwards. I talked to the people at the barbecue. I made a list. I did a process of elimination. I studied his pictures. That's something that the jury could have done. I think counsel may have misspoken, talking about the other evidence, saying that the vehicle belonged to Mr. Johnson. Just to be clear, the black truck that was involved in the August 17th murder did not belong to my client. It belonged to Tanaski and Mourning. There was no dispute about that. And then getting to the connection between Mr. Johnson and the SAG arms rifle that was used in the shooting, the pictures that were admitted were from July 2019, and the state's witnesses testified. They didn't know if that meant they were taken at that time or just saved to the cloud at that time, so we actually have no idea how old these pictures were. The murder took place in August 2020. So at least over a year, Mr. Johnson was photographed with similar-looking weapons. Was there an objection as to the foundation of that? There were objections. We're not really objecting to the foundation of those pictures. We're just arguing that they didn't really – it wasn't a solid enough link to consider that a strong enough piece of evidence. It wasn't the day before that he was on Facebook posing with the SAG arms rifle, and the next day it's used. It was over a year before. We saw that from the firearm evidence from that shooting in March. There were multiple guns found in that car. There's a lot of guns that seem to be getting passed back and forth. This is a long record. I apologize. But was there an objection to that, and was there a cross-examination related to the timing of that picture? I mean, was it a year old? Our position is not that it was inadmissible. We're just arguing that it wasn't as strong a link to the murder as the state suggested that it was, because it is significant that the murder weapon was found during a search of a parolee named Glenn Grissett, who he wasn't there at trial. We don't know how he got the gun. The state just wants – the state wanted the jury to speculate that – they actually argued in closing that he got a good deal for it because Mr. Johnson sold it to him, and there was no evidence about that. And while the state today is arguing that he specifically mentioned Mr. Grissett, the people who reviewed it in their testimony weren't sure if he named him. But regardless, he was arrested that day. They were both in Jackson County together, not a huge place, not unusual to be aware of somebody else getting arrested that day. India Martin, if you review the video chat where they have this 10-second conversation, doesn't react. It's just like an offhand comment about a new arrival at the jail. That's not sufficient to say, oh, no, the murder weapon has been found that I sold to my friend Glenn. That's not what happened here. So the connection to the gun is these more than year old photos. Two months later, they're locked up in Jackson County together. So that's pretty speculative. And I just also wanted to touch on the fact that he went to Florida with India Martin. We need to remember that earlier that afternoon, Jamonte Jr. shot up her house while she was outside. She's pregnant. She's with her sister and their children, and they're terrified. They call the police, and the police officers come and say, according to India Martin's testimony, that you're still in danger, we're going to try to arrest him, but I suggest you go stay in a hotel and you're safe until that happens. So the fact that a few hours later she leaves with Mr. Johnson, even after all of this, was, according to her, for her own safety. And I just want to touch on, there was a pretrial motion to suppress the statement based on an invocation of counsel. And that's not an argument that we've raised, but it does show that counsel recognized that this statement, the audio interview, was damaging because of all the hearsay that it contained. So the argument that it was strategy to include it because he denies being involved doesn't really add up because counsel recognized this as damaging. The most inflammatory comments were in just the last few minutes, like minutes 32 to 35. That's where Detective Nutting starts pouring out, like, oh, well, Michael Williams said it was you and him, Victor, or, sorry, not Victor, Jim Monte, Allison said it was you. Michael Williams said that you deliberately were going to retaliate against Jim Monte and his father because of what happened to Ms. Martin, and, you know, that you celebrated, yeah, and were, yeah, we got him, we got him. Or if we can't get the son, we'll get the dad. That didn't need to provide context because at that point, Mr. Johnson was just like, nope, none of this. I'm getting a lawyer. I'm going to disprove this in court. He's not, he did not change his story. He continued to deny. So for all of these reasons, unless your owners have any further questions, we ask that you reverse and remand for a new trial. Okay. Thank you, Ms. Dunwoody. Thank you, Mr. Booz, for your arguments. We went a little over, but I appreciate you answering our questions today. If the matter will be taken under advisement, we'll issue an order in due course. Appreciate it. Thank you.